UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

J.E., individually and on behalf of J.G.,

                                    Plaintiff,

                    -v-

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

                                  Defendant.

15-CV-7799 (JPO)

OPINION AND ORDER

---------------------------------------------------------------

J. PAUL OETKEN, District Judge:

      Plaintiff J.E. filed this action against the New York City Department of Education ("the Department" or "DOE") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Article 89 of the New York State Education Law, N.Y. Educ. Law § 4401 *et seq.* She challenges two administrative decisions of State Review Officers denying private school tuition funding for her minor daughter, J.G., whom she unilaterally enrolled in the Rebecca School ("Rebecca"), arguing (1) that her daughter was denied a free appropriate public education; and (2) that she is entitled to reimbursement for her daughter's tuition at Rebecca for the 2012-2013 school year. Both parties now move for summary judgment. For the reasons that follow, Plaintiff's motion is granted and Defendant's cross-motion is denied.

**I.    Background**

      Following a series of hearings, Independent Hearing Office ("IHO") Schiff (1) found that the Department had failed to provide J.G. with a free and appropriate education ("FAPE") for the 2012-2013 school year; (2) found that the parents had acted appropriately by enrolling their child in the Rebecca School; and (3) ordered the DOE to provide appropriate equitable relief. (*See* January 21, 2014 IHO Decision ("IHO 1") at 15-16.) State Review Officer ("SRO") Bates

1

reversed the IHO's finding that J.G. had been denied a FAPE and remanded the matter to the IHO to address numerous other issues.  (*See* March 30, 2014 SRO Decision ("SRO 1") at 16.) On remand, after a hearing, IHO Noe determined that the DOE had indeed offered a FAPE and, accordingly, denied J.G. relief.  (April 22, 2015 IHO Decision at 8.)  Plaintiff appealed the IHO decision to SRO Bates, who dismissed the appeal and held that the child had been offered a FAPE.  (*See* July 23, 2015 SRO Decision at 25.)  Plaintiff then filed this action challenging the decision of the SRO that J.G. was not denied a FAPE.

    A.    **Legal Framework**

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education" and "to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A), (B).  A FAPE should "emphasize[ ] special education and related services designed to meet [a disabled child's] unique needs and prepare [the child] for further education, employment, and independent living."  *Id.* § 1400(d)(1)(A).  States that provide a FAPE to all children with disabilities are eligible for federal funding under the IDEA.  *Id.* § 1412(a)(1)(A); *see Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).  New York State receives federal funds under the IDEA; therefore, it must comply with the Act's requirements.  *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998).

The IDEA requires that a state provide each disabled child with an individualized education program ("IEP").  *See* 20 U.S.C. § 1414(d)(1)(A).  The IEP is "[t]he 'centerpiece' of the IDEA's education delivery system."  *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).  The IEP is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially

2

designed instruction and services that will enable the child to meet those objectives.'" *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507-08 (2d Cir. 2006) (quoting *Honig*, 484 U.S. at 311); *see also* 20 U.S.C. § 1414(d)(1)(A) (defining "IEP"). The IEP is developed as a collaborative effort among "parents, educators, and representatives of the school district." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005) (quoting *Murphy*, 297 F.3d at 197).

The IEP should be formulated in accordance with the procedures set forth in the IDEA and must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982). But the IEP need not "furnish every special service necessary to maximize each handicapped child's potential." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (quoting *Rowley*, 458 U.S. at 199) (alterations and internal quotation marks omitted).

New York State law also secures students' right to a FAPE. N.Y. Educ. Law § 4401 *et seq.* (McKinney 2014). New York law requires local Committees on Special Education ("CSEs") to develop IEPs for disabled children. N.Y. Educ. Law § 4402(1)(b)(1); *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012). The CSE team must include, at least: the parents or guardians of the disabled child in question; the child's regular education teacher; the child's special education teacher; a school psychologist; and a district representative "who is qualified to provide or administer or supervise special education and is knowledgeable about the general curriculum and the availability of resources of the school district," among other individuals. N.Y. Educ. Law § 4402(1)(b)(1)(a). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-08 (2d Cir. 2007) (internal citations

omitted). The IEP team must consider all options available in the public schools prior to recommending a non-public school. *See P.G. v. N.Y. City Dep't of Educ.*, 959 F. Supp. 2d 499, 505 n.1 (S.D.N.Y. 2013). If the IEP team recommends that a child attend a non-public school, the case is sent to the Central Based Support Team ("CBST") for placement at a state-approved non-public school. *See id.*; NYC Department of Education, Other School Settings, http://schools.nyc.gov/Academics/SpecialEducation/SupportsServices/OtherSchoolSettings/default.htm (last visited January 23, 2017).

A parent who believes that his or her disabled child has been denied a FAPE under the IDEA may unilaterally place that child in a private school and then seek reimbursement from the school district. 20 U.S.C. § 1412(a)(10)(C)(ii); *Hardison v. Bd. of Educ.*, 773 F.3d 372, 376 (2d Cir. 2014); *see also Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985) ("*Burlington*"); *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993) ("*Carter*"). Parents who choose this path "do so at their own financial risk." *Carter*, 510 U.S. at 15 (quoting *Burlington*, 471 U.S. at 373-74) (internal quotation marks omitted); *see generally* 20 U.S.C. § 1412(a)(10)(C).

To determine whether a parent is entitled to reimbursement, a court applies the three-prong *Burlington/Carter* test, "which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014). The reimbursement covers "expenses that [the school district] should have paid all along and would have borne in the first instance had it developed a proper IEP" and provided a FAPE. *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (quoting *Burlington*, 471 U.S. at 370-71) (internal quotation marks omitted).

Parents seeking reimbursement under New York law must file a due process complaint challenging the appropriateness of the school district's recommendation. A hearing on this complaint is held before an IHO. 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1). The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the decision of the SRO may be challenged in state or federal court, 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)(a).

### B.     Factual Background

The following facts and procedural background are taken from the parties' submissions and the administrative record.

J.G. is a child with autism born in April 2005. (Ex. 2 at 1.[1]) J.G. attended the Rebecca School during the 2010-2011 and 2011-2012 school years. (*Id.*) The Rebecca School is a private school in Manhattan for children with autism and other neurodevelopmental delays. *See J.W. v. N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 598 n.2 (S.D.N.Y. 2015). On March 7, 2012, the CSE convened to prepare an IEP for J.G. for the 2012-2013 school year. (*Id.*) The CSE consisted of (1) Linda Watinsky, a DOE Special Education Teacher; (2) Craig Czarnecki, who attended in the dual functions of school psychologist and District Representative; (3) Naomi Flick, a DOE social worker; (4) Yael Rubinstein, J.G's teacher at Rebecca; (5) Gwen Levin, a Rebecca social worker; (6) a parent member; and (7) the Student's mother, J.E. (Ex. 2-13.) In relevant part, the IEP recommended a 6:1:1 classroom (six students to one teacher and one classroom paraprofessional), related services of speech-language therapy, occupational therapy and physical therapy, and a 1:1 health paraprofessional for J.G. for the 2012-2013 school year (Ex. 2-7, 2-8), which was to be implemented on July 2, 2012 (Ex. 2-1). The 6:1:1 ratio, the

---

[1] References to "Ex. __" are to the exhibits submitted by the parties during the IHO 1 proceedings. References to "Tr." are to the transcript of the IHO 1 hearings.

"most supportive public school option," *A.D. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2673, 2013 WL 1155570, at *7 (S.D.N.Y. Mar. 19, 2013), is specifically designated by the State for "students whose management needs are deemed to be highly intensive, and requiring a high degree of individualized attention and intervention."  8 N.Y.C.R.R. § 200.6(h)(4)(ii)(a).

On March 14, 2012, J.E. wrote to the CSE, informing it of her belief the 6:1:1 ratio was "inappropriate." (Ex. B-1.) In the letter, she noted: "When we advocated for the one to one class placement, the CSE/IEP chairperson stated that the NYC public school system did not have any schools/classes functioning with a one to one, teacher to student ratio." (*Id.*) The letter requested that J.G.'s case be referred to CBST for placement at a state-approved non-public school. The CSE did not respond to the letter. (Dkt. No. 18 at 2.)

On June 11, 2012, J.E. was notified that her daughter was offered placement at a public school called P771K@P225K. (*Id.*) On July 25, 2012, J.E. wrote to the district, explaining why she believed the proposed placement to be inappropriate for her daughter. (*See* Ex. E.) J.E. filed a due process complaint seeking tuition reimbursement on May 7, 2013, alleging that the IEP and proposed public school location were inappropriate. (*See* Ex. A.) J.E. rejected the Department's recommendation for the 2012–2013 school year and unilaterally placed J.G. in the Rebecca School. (Dkt. No. 23 at 1.) J.E. asserts that her daughter was denied access to a FAPE in the 2012–2013 school year and moves this Court to order that the Department reimburse J.G.'s Rebecca School tuition for that year, totaling $97,700. (Dkt. No. 18 at 22.)

## II. Discussion

"IDEA actions generally are resolved on summary judgment." *J.W.*, 95 F. Supp. 3d at 600 (quoting *S.H. v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 1041, 2011 WL 666098, at *2 (S.D.N.Y. Feb. 15, 2011)). However, unlike typical summary judgment motions, in an IDEA action, "the procedure is in substance an appeal from an administrative determination, not a summary

judgment motion." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (quoting *Lillbask*, 397 F.3d at 83 n.3) (internal quotation mark and brackets omitted).  Thus, "[s]ummary judgment in this context . . . is a 'pragmatic procedural mechanism for reviewing administrative decisions.'" *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)).  The inquiry focuses on "whether the administrative record, together with any additional evidence, establishes that there has been compliance with the IDEA's processes and that the child's educational needs have been appropriately addressed." *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 498 n.1 (S.D.N.Y. 2013) (quoting *Wall v. Mattituck–Cutchogue Sch. Dist.*, 945 F. Supp. 501, 508 (E.D.N.Y. 1996)) (internal quotation mark omitted).

"While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.O.*, 793 F.3d at 243 (quoting *A.C.*, 553 F.3d at 171).  However, "the 'due weight' [that courts] ordinarily must give to the state administrative proceedings. . . is not implicated with respect to . . . issue[s] of law." *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997).

Where, as here, the initial IHO decision and the SRO decisions are in conflict, "the Court should generally defer to the SRO's decision as the final decision of the state authorities." *J.W.*, 95 F. Supp. 3d at 601 (quoting *FB v. N.Y.C. Dep't of Educ.*, 923 F. Supp. 2d 570, 578 (S.D.N.Y. 2013)) (internal quotation marks omitted).  However, "the court may reject factual findings that are not supported by the record or are controverted by the record." *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 547 (S.D.N.Y. 2010) (quoting *C.B. ex rel. W.B. v. N.Y.C. Dep't of Educ.*, No. 02 Civ. 4620, 2005 WL 1388964, at *13 (E.D.N.Y. June 10, 2005)) (internal

quotation marks and bracket removed). And where the district court "appropriately concludes that the SRO's determinations are insufficiently reasoned to merit . . . deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges." *J.W.*, 95 F. Supp. 3d 592 (citing *F.B.*, 923 F. Supp. 2d at 578). Moreover, different types of determinations are afforded different weight. In reviewing the adequacy of an IEP, as here, "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *M.H.*, 685 F.3d at 244.

J.E. argues that her daughter, J.G., was denied a FAPE and that she is entitled to reimbursement for placement of J.G. at the Rebecca School under the three-prong *Burlington/Carter* test. The initial administrative hearings addressed each prong. (*See* IHO 1 at 10-15.) The reviewing SRO reversed on the first prong, did not reach the second or third prong, and remanded for consideration of other issues. (SRO 1 at 13-16.)

The Court goes through each of the three prongs to determine (1) whether the school district's proposed plan provided J.G. a FAPE; (2) whether the parents' private placement of J.G. at Rebecca was appropriate to the child's needs; and (3) whether the equities favor reimbursement.

### A.    Provision of a FAPE

In addressing the first prong of the *Burlington/Carter* test—whether the school district offered the student a FAPE for a given school year—this Court considers two factors: (1) whether the student's IEP was developed according to the IDEA's procedural requirements, and (2) whether the educational plan set forth in the IEP was reasonably calculated to confer

substantive educational benefit on the student. *See Walczak*, 142 F.3d at 129 (citing *Rowley*, 458 U.S. at 206-07). J.E. argues that neither factor is satisfied.

Turning first to the sole alleged procedural violation, J.E. argues that the IEP was impermissibly predetermined, as the CSE failed to consider J.E.'s concerns regarding the student-to-teacher ratio for her daughter's education. (Dkt. No. 18 at 8-11.) This failure, she argues, deprived her of the opportunity to meaningfully participate in the development of the IEP. "As the Supreme Court has emphasized, the IDEA is solicitous of parents' participatory rights," including "*an opportunity for meaningful input into all decisions affecting their child's education* and the right to seek review of any decisions they think inappropriate." *FB v. N.Y.C. Dep't of Educ.*, 132 F. Supp. 3d 522, 538-39 (S.D.N.Y. 2015) (quoting *Honig*, 484 U.S. at 311-12) (internal quotation mark omitted).

The IDEA requires that parents of a child with a disability be afforded an opportunity to "examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child." 20 U.S.C. § 1415(b)(1). In this way, predetermination of a child's IEP without meaningful parental input constitutes a procedural violation of Section 1415, which "can rise to the level of a substantive harm, and therefore deprive a child of a [FAPE] . . . ." *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sen. Dist.*, 777 F. Supp. 2d 606, 648 (S.D.N.Y.2011). Indeed, the "core of the statute" is that the IEP be developed pursuant to a "cooperative process" between the parents and the district. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). Predetermination, therefore, by a district of a child's IEP without meaningful parental input undermines the fundamental goal of the IDEA, which is to give parents a meaningful voice in the educational upbringing of their children. *J.G.*, 777 F. Supp. 2d at 648.

Courts have found that a parent's participation was meaningful under the IDEA where, for example, the parent "participated at the IEP meetings . . . and contributed to the Student's final IEP," and where "the DOE responded to the Student's mother's request by amending the Student's IEP," which "incorporated evaluations of the Student conducted by professionals of the Plaintiffs' choosing and the goals those professionals recommended." *M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ.*, 583 F. Supp. 2d 498, 506-07 (S.D.N.Y. 2008); *see also S.W. v. N.Y. Dep't of Educ.*, 92 F. Supp. 3d 143, 157 (S.D.N.Y. 2015) (finding no procedural violation where the "CSE team responded to [the parent's] concerns" by expressly considering and rejecting more placement options advocated for by the parent based on review of relevant evidence in the record of the student's performance). And while the CSE need not adopt a parent's recommendation for any particular aspect of an IEP, as was the case in *M.M.*, "it may not deprive the Parent of meaningful participation by refusing to consider . . . the Parent's concerns." *E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 551 (S.D.N.Y. 2016).

In addressing claims of predetermination, courts ask whether school district personnel entered a CSE meeting with an "open mind" regarding the programs and services that might be ultimately recommended in a given IEP. *See id.* at 650 (S.D.N.Y. 2011). "For an IEP to be predetermined, the district must 'not have an open mind' to consider alternative programs or services during the meeting." *A.P. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 477, 2015 WL 4597545, at *8 (S.D.N.Y. July 30, 2015) (quoting *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253 (2d Cir. 2009)).

Here, the IEP developed for J.G. recommended a 6:1:1 classroom, among other requirements. (Ex. 2-8.) J.E. advocated for a more restrictive, 1:1 program for J.G. She made her position known both at the IEP meeting (*see* Ex. 8-3 to -4), and in the letter addressed to the

CSE a week following the meeting (*see* Ex. B). The crux of J.E.'s argument is that her position was not considered by the CSE in the development of the IEP, such that her participation in the meeting was "mere form" and that the IEP was "predetermined" without her input, resulting in the denial of a FAPE for J.G. (Dkt. No. 18 at 9-10; *see Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004) ("Participation must be more than a mere form; it must be *meaningful*."))

IHO Schiff found that "[t]he CSE did not address or assess the child's needs for intense 1:1 adult supervision and support." (IHO 1 at 11.) The IHO credited the "parents' allegations that the child needs far more adult support to learn than what was provided by the CSE." (*Id.*) The IHO found therefore that "the CSE offered its 6:1:1 program as a matter of administrative convenience and a pre-determined outcome." (*Id.*) On appeal, the SRO disagreed, finding that the "the parent was provided with, and took advantage of, the opportunity to meaningfully participate in the development of the March 2012 IEP by expressly voicing her disagreement with the March 2012 CSE's recommendation of a 6:1+1 special class placement." (*Id.* at 13.) The SRO concluded that the IEP was "not predetermined or selected upon administrative convenience, but rather, was reached upon consideration of the student's needs and how the 6:1+1 class placement could meet the student's needs." (SRO 1 at 13.)

Because this inquiry relates to the record that was before the SRO, it would normally merit increased deference. *M.H.*, 685 F.3d at 244 ("[T]he district court should afford more deference when its review is based entirely on the same evidence as that before the SRO . . . ."). But here, the SRO did not rely on the record to determine whether the CSE considered if the child required a more restrictive ratio than 6:1:1.[2] The SRO found that "the March 2012 CSE

---

[2] The SRO's decision does point to "evidence in the hearing record [to] demonstrate[] that the March 2012 CSE considered, but rejected other placement options for the student for the

11

did not defer the student to the CBST because the March 2012 CSE concluded that a 6:1+1 special class placement was appropriate." (SRO 1 at 13.) But this finding does more to confirm the fact that the CSE refused to even consider more restrictive non-public placement options than to rebut it. Indeed, at the hearing, the district school psychologist and district representative, Dr. Czarnecki, did not recall whether a discussion took place regarding whether J.G.'s case should be referred to the CBST. (Tr. at 114.) And though he testified that notes of such a discussion would be found in the minutes of the meeting (Tr. at 115), the minutes do not reflect that such a discussion took place (*see* Ex. 8). Furthermore, Dr. Czernecki was asked: "[I]f the team had looked at all of the offering on the [public special education] continuum and thought that there was no appropriate program for the student, what do you do in that instance?" (Tr. at 180.) He responded that he would "defer the recommendation to the [CBST] for them to determine if we had indeed exhausted the various public special education options out there." (*Id.*) But the CSE did not defer the matter to the CBST and this testimony refers only to what the CSE would have done had it considered the parent's request; it does not indicate that the CSE had any intention of considering referral to the CBST in this case. The record reflects that the CSE failed to even consider the options desired by the parent. As such, the SRO did not rely on the record to satisfactorily explain why the parent was denied an opportunity to meaningfully participate in a conversation about the appropriate teacher to student ratio for the child's education, and its review was neither "thorough" nor "careful." *See Walczak*, 142 F.3d at 129. The SRO's finding is not supported by a preponderance of the relevant evidence, and its reasoning is neither

---

2012-2013 school year" (SRO 1 at 12); but each of those options contemplated a less restrictive ratio than 6:1:1, rather than a more restrictive ratio, for which the parent advocated. *See S.Y. v. N.Y.C. Dep't of Educ.*, No. 15 Civ. 6277, 2016 WL 5806859, at *9 (finding "[e]vidence that the CSE considered [less-restrictive] ratios [was] not responsive to the Parents' allegation that the CSE failed to consider [a more restrictive ratio].").

persuasive nor consistent with the proper inquiry; therefore, the Court need not defer to its conclusion.[3]  *See E.H.*, 164 F. Supp. 3d at 553.

Declining to defer to the SRO's determination, this Court turns to its own analysis.  This case's facts are analogous to those in *E.H.*  164 F. Supp. 3d 539.  In *E.H.*, the plaintiff argued that the CSE's failure to consider the parent's view that the student required a more restrictive classroom ratio of 2:1, as opposed to the 6:1:1 ratio offered by the IEP, constituted impermissible predetermination and a denial of the parent's right to meaningfully participate in the development of the student's IEP.  *See* 164 F. Supp. 3d at 551.  There, as here, the IHO found that the CSE's failure to consider a more restrictive non-public setting for the student denied the parent procedural rights under the IDEA and constituted the denial of a FAPE.  *Id.* at 551.

In both cases, "[t]he DOE and SRO effectively cast the Parent's argument as an objection that the CSE did not adopt her opinion, rather than one related to her meaningful participation." *Id.* at 552.  While it is true that "[m]ere parental disagreement with a school district's IEP and placement recommendation does not amount to a denial of meaningful participation," *A.P.*, 2015

---

[3] Unlike the SRO, the IHO concluded that the student was denied a FAPE.  The IHO scrutinized Dr. Czarnecki's testimony and weighed it against that of the parent and a member of the Rebecca School staff.  He noted that Dr. Czarnecki "never attempts to explain why the CSE offered the child the 6:1:1 special education program that if offered and why such a program was expected to provide a FAPE" even though he testified that he "recalled that the parent and a Rebecca School person at the CSE meeting disagreed with the CSE's 6:1:1 program recommendations" because they were not supportive enough. (IHO 1 at 10.)  The IHO found that the CSE simply failed to "address or assess the child's needs for intense 1:1 adult supervision and support" in spite of the parent's and Rebecca School professional's "allegations that the child needs far more adult support to learn than what was provided by the CSE." (*Id.* at 11.)

The IHO properly applied the procedural requirements of the IDEA, determining whether the CSE considered the parent's concerns and, if not, whether that failure to allow meaningful participation rose to the level of the denial of a FAPE.  It concluded that the 6:1:1 program was offered "as a matter of administrative convenience and [was] a pre-determined outcome." (*Id.*)  Because this analysis is persuasive and in keeping with the procedural safeguards of the IDEA, the Court agrees.  *See M.H.*, 685 F.3d at 246.

WL 4597545, at *8, the CSE still has a *procedural* obligation to consider whether a student requires a more restrictive ratio than is available through public schools (and to refer J.G.'s case to the CBST if so). "If the CSE refused to consider a more restrictive ratio than its public offerings were able to provide, that would amount to predetermination of [J.G.'s] education program regardless of what [J.G.] needed or what [her] Parent contributed to the process." *E.H.*, 164 F. Supp. 3d at 552; *see also S.Y.*, 2016 WL 5806859, at *9 (finding procedural violation of the IDEA where the Department failed to "g[i]ve due consideration" to the parents view that the student required a more restrictive ratio than was recommended by the DOE).

      The DOE's attempt to distinguish *E.H.* from the present case fails. It argues that "this case is easily distinguished from *E.H.*, for in this case, Plaintiff did not request a smaller program than the 6:1:1 setting recommended by the CSE until *after* the CSE meeting itself." (Dkt. No. 27 at 5.) This assertion is belied both by the SRO's reliance on the testimony of a district representative that the parent and Rebecca School staff disagreed with the 6:1:1 ratio at the CSE meeting (SRO 1 at 13 (citing Tr. 80-82, 116-18, 161-17)), and by the minutes from the CSE meeting itself (Ex. 8-3 to -4 (noting "[b]oth teacher & parent feel a lower student to teacher ratio is more appropriate for [J.G.][;] [m]other feels [J.G.] needs 1:1 assistance")). The DOE also argues that this case is distinguished from *E.H.* because the CSE demonstrated a "willingness to defer the Student for potential private placement, if necessary." (Dkt. No. 23 at 18.) As discussed above, the record does not support this assertion.

      Simply put, the IDEA "does not require that a parent's view need only be considered if it is consistent with available public offerings." *E.H.*, 164 F. Supp. 3d at 552-53; *see also S.Y.*, 2016 WL 5806859, at *9 ("The IDEA does not permit the categorical rejection of placements outside the public school system.") Where, as here, the parent and the child's teachers advocated for a more restrictive environment not available through a public school option, the CSE had a

duty to expressly consider that option. *See S.Y.*, 2016 WL 5806859, at *9 (finding a procedural violation of the IDEA where "[b]oth [the parent] and [the student's] Rebecca School teacher expressed to the CSE that [the student] required" a more restrictive classroom ratio, but were denied their request without "due consideration").

As the SRO found, and the DOE argued, the CSE considered a special class in a community school as well as special classes in specialized schools with 8:1:1 and 12:1:4 ratios, and found that these classes were not appropriate. (*See* Dkt. No. 23 at 7; SRO 1 at 12.) Instead, the CSE adopted a 6:1:1 ratio. The Rebecca School, where J.G. had been enrolled for two years, maintains an even more restrictive 2:1 ratio. (Dkt. No. 18 at 9.) Substantively, it may be the case that a 2:1 ratio is unnecessary, and the CSE was correct in adopting the 6:1:1 ratio, "[b]ut the CSE *was* obligated to consider the Parent's point of view that a 6:1:1 placement was not appropriate for [J.G.] and 2:1 was necessary, particularly in light of the fact that [J.G.] was then being educated in a 2:1 ratio." *E.H.*, 164 F. Supp. 3d at 553.

"Procedural violations warrant tuition reimbursement only if they 'impeded the child's right to a [FAPE], significantly impeded the parents' opportunity to participate in the decision[-]making process, or caused a deprivation of educational benefits.'" *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131 (2d Cir. 2013) (quoting *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012)). The individual procedural violations in this instance seriously infringed on J.E.'s right to a FAPE, the parent's right to meaningfully participate in the creation of the student's IEP, or both. *See K.R. v. N.Y.C. Dep't of Educ.*, 107 F. Supp. 3d 295, 309-10 n.120 (S.D.N.Y. 2015) ("[T]he [IDEA] provides that the fact of the procedural violation, if it significantly impedes the parents' opportunity to participate in the decisionmaking process, is a harm unto itself that results in the denial of a FAPE." (citing 20 U.S.C. § 1415(f)(3)(E)(ii))).

J.G. has demonstrated a procedural violation of the IDEA that rises to the level of a denial of a FAPE under the first prong of the *Burlington/Carter* test.

Because this Court finds that the IEP is procedurally inadequate, it need not determine whether it was substantively sufficient.[4] *See Cerra*, 427 F.3d at 192 (2d Cir. 2005) (noting that if the IEP is "procedurally *or* substantively deficient, we proceed to the" next step of the *Burlington/Carter* test) (emphasis added)); *see S.Y.*, 2016 WL 5806859, at *12 ("Because the Court finds that the DOE denied [the student] a FAPE on the basis of procedural violations, it need not address the parties' arguments with respect to the IEP's substantive adequacy and [the chosen public school's] ability to implement the IEP.") (citing *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 876 n.3 (2d Cir. 2016)).

### B. Appropriateness for J.G.'s Needs

Having found a procedural deficiency sufficient to support a finding in favor of the parent under the first prong of the *Burlington/Carter* test, the Court turns to the second prong: whether the parents' private placement is appropriate to the child's needs. "Parents bear a lower burden to demonstrate the appropriateness of a private placement than school districts do to demonstrate the provision of a FAPE because 'parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a [FAPE].'" *T.K.*, 810 F.3d at 878

---

[4] This Court notes, however, that it questions the substantive sufficiency of the IEP offered in this case. Where the parent and the student's prior teacher advocate for a more restrictive ratio, there is reason to believe that the IEP's deviation toward a less restrictive classroom environment—without documentation indicating that such a deviation is appropriate—constitutes a substantive violation of the IDEA. *See A.M. v. N.Y.C. Dep't of Educ.*, No. 15 Civ. 4076, 2017 WL 83384, at *15-16 (2d Cir. Jan. 10, 2017) (finding that, where a district representatives' views are "against the clear consensus of the substance of the evaluative materials present at the CSE meeting and the views of [the student's] evaluators and educational instructors," the resulting IEP "was not 'reasonably calculated to enable [the student] to receive educational benefits,'" rendering the IEP "substantively inadequate" and depriving the student of a FAPE) (quoting *Rowley*, 458 U.S. at 207).

(quoting *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006)). Parents meet their burden by demonstrating "that the placement is reasonably calculated to enable the child to receive educational benefits," but need not show that the placement "furnishes every special service necessary to maximize their child's potential." *Id.* (quoting *Frank G.*, 459 F.3d 364–65) (internal quotation mark omitted).

"Appropriateness" depends on whether the child can expect to derive educational benefit from the placement—that is, whether it is "likely to produce progress, not regression." *Gagliardo*, 489 F.3d at 112. "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances." *Id.* (quoting *Frank G.*, 459 F.3d at 365). "A unilateral private placement is only appropriate if it provides 'education instruction *specifically* designed to meet the *unique* needs of a handicapped child.'" *Id.* at 115 (quoting *Rowley*, 458 U.S. at 188-89) (emphasis in original).

The SRO did not reach the issue of whether or not the Rebecca School is appropriate for J.G.'s needs and "courts should defer to the IHO's analysis when considering an issue not reached by the SRO." *C.F. ex rel. R.F.*, 746 F.3d at 77 (citing *M.H.*, 685 F.3d at 252). (SRO 1 at 13-14.) Indeed, "[d]eference to the IHO's finding is sufficient to meet the Parent's burden of demonstrating the appropriateness of the private placement." *E.H.*, 164 F. Supp. 3d at 557. The IHO concluded that, "[i]t is clear from the testimonial and documentary evidence in the parents' direct case that the Rebecca School as an education selection falls within the relaxed standards of *Frank G.*" (IHO 1 at 14.) The IHO referred to testimony from the program director at the Rebecca School, who had observed J.G. and concluded that the school was appropriate for her. (*Id.*) The IHO also considered the testimony of the child's occupational therapist at the Rebecca School, who concluded J.G. was becoming more regulated, contributing to progress overall.

(*Id.*)  The IHO characterized the testimony of these witnesses as "persuasive and detailed" with respect to the Rebecca School's ability to "address[] the child['s] various needs including but not limited to regulating her actions and emotions, improving her communication, language, articulation and reading readiness as well as providing parent training and counseling."  (*Id.*)

The DOE did not address the appropriateness of the Rebecca School in its briefing on summary judgment before this Court.  However, it did argue at prior proceedings that the Rebecca School's failure to provide a 1:1 paraprofessional rendered the school inappropriate.  (*See* Dkt. No. 18 at 17.)  But the Rebecca School has the capacity to provide such an individual if necessary (*id.* at 18), and, in any event, the IHO addressed and rejected that argument on the basis that the Rebecca School provided supervisors with better credentials than a paraprofessional would have (*see* IHO 1 at 12).

J.E. further identifies areas where the Rebecca School is specifically addressing J.G's unique needs.  For example, Rebecca provides a continuity of instructors over time to satisfy J.G's sensory needs, it sets detailed individualized plans for J.G. twice a year, and it addresses J.G.'s specific sensory diet.  (Dkt. No. 18 at 18.)  Defendant does not dispute that the Rebecca School offers these services and does not dispute that they are necessary to J.G.'s education.  The record establishes that the Rebecca School placement is appropriate under the relevant standard.

### C. Equitable Considerations

Having found that the first two prongs of the *Burlington/Carter* test are satisfied, the Court turns to the third prong:  whether the equities favor reimbursement.  The court enjoys "broad discretion" in considering equitable factors to fashion relief after it has found a violation of the IDEA.  *Carter*, 510 U.S. at 16 (quoting *Burlington*, 471 U.S. at 374 (1985)).  "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required."  *Id.*

Moreover, a request for tuition reimbursement for a unilaterally chosen private school may be reduced or denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents." *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III).  Here, the record demonstrates a willingness on the parent's behalf to participate in the DOE process.  As the IHO found, the parents "gave proper and timely notice to the DOE of their plans to enroll the child at the Rebecca School" and "cooperated in good faith at all times with the DOE."  (IHO 1 at 14-15.)  The record does not show any obstruction or intransigence to participate in the DOE process that would counsel against reimbursement.  *See, e.g.*, *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000) (finding "reimbursement is barred" because the parent "unilaterally arrange[d] for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP"); *Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P.*, 373 F. Supp. 2d 402, 416 (S.D.N.Y. 2005) (denying reimbursement because the parents had no "intention of allowing the child to be educated in the public school, and did everything possible so that they could frustrate a timely review").  The Court agrees with the IHO's finding that "[t]here is no persuasive evidence offered by the DOE of equitable factors that warrant denying the child's claim for relief."  (IHO 1 at 14.)

The IDEA mandates that "public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice." *Carter*, 510 U.S. at 15 (1993).  Where, as here, defendants have done neither, and "it would be inequitable to reward the [Department] for its admitted failure to comply with IDEA," *M.V. v. Shenedehowa Central Sch. Dist.*, No. 06 Civ. 0571, 2008 WL 53101, at *5 (N.D.N.Y. Jan. 2, 2008), the equitable considerations favor reimbursement of the parent.

Accordingly, the Court concludes that equitable considerations warrant the reimbursement of Plaintiff's $97,700 tuition payment for the 2012-2013 school year.

### III. Conclusion

For the foregoing reasons, J.E.'s motion for summary judgment is GRANTED and the DOE's motion for summary judgment is DENIED. The Clerk of Court is directed to close the motions at Docket Numbers 17 and 22 and to terminate the case.

SO ORDERED.

Dated: January 23, 2017
       New York, New York

_____
J. PAUL OETKEN
United States District Judge